FILED
2006 Sep-05 PM 04:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

| | |
|---|---|
| BRAD HILL, the Administrator of The Estate of Billy Michael Hill, Deceased,<br><br>Plaintiff,<br><br>v.<br><br>RONNIE MAY, et al.,<br><br>Defendants. | }<br>}<br>}<br>}<br>}<br>} CASE NO. 3:03-CV-0745-RDP<br>}<br>}<br>}<br>} |

## MEMORANDUM OPINION

**I.     Background**

Pending before the court is Defendant George Luckey, M.D.'s ("Defendant Luckey") Motion for Summary Judgment (Doc. #86) filed on July 17, 2006 and Motion to Strike the Testimony of Simon N. Whitney, M.D. (Doc. #110) filed on August 2, 2006. On July 25, 2006, Plaintiff opposed Defendant Luckey's motion for summary judgment (Doc. #73). As Plaintiff did not timely respond to Defendant Luckey's motion to strike the testimony of Simon N. Whitney, M.D., on August 16, 2006 the court ordered Plaintiff to show cause why Defendant Luckey's motion to strike should not be granted, issuing and order to show cause (Doc. #112). Plaintiff responded to the court's order to show cause and Defendant Luckey's motion to strike on August 21, 2006 in his response to the court's order to show cause (Doc. #113). Defendant Luckey replied to Plaintiff's response to Defendant Luckey's motion to strike on August 24, 2006 (Doc. #114).

**II.    Statement of Facts**

Plaintiff is the administrator of the estate of his father, Billy Michael Hill (hereinafter "Mr. Hill"). Defendants are several employees of the Colbert County Jail System, including Defendant

George Luckey, M.D., a doctor who provided medical services for the Colbert County jail.  (Doc. #1 ¶ 40).

Mr. Hill had a history of mental illness.  On April 10, 2001, Mr. Hill was arrested by the Colbert County Sheriff's Department and placed in the Colbert County jail for the felony murder of John Simon Hurst. (Doc. #1 ¶ 16, Doc. #75 ¶ I-1).  At the time of his arrest, Mr. Hill had some injuries, which included a dog bite injury to his right ear.  (Doc. #75 ¶ I-1).  During the inventory search of his residence, two prescription drugs were found.  (*Id*. at ¶ I-2).

On the morning of April 11, 2001, Mr. Hill was taken to the emergency room at Helen Keller Hospital where he was seen on a non-emergency basis at 9:00 a.m., given a medical examination, treated for a dog bite, and given a tetanus shot and drug screen.  The physician at Helen Keller Hospital discharged Mr. Hill to the Colbert County Jail.  (*Id*. at ¶ I-5).

Dr. Luckey saw Mr. Hill at the Colbert County Jail on the morning of April 13, 2001.  After examining a few inmates in the prison exam room, Deputy Dale Holley told Dr. Luckey about Mr. Hill, and that he would have to examine him in his cell. (*Id*. at ¶ I-6).  Dr. Luckey was accompanied by three or four jailers or deputies during Mr. Hill's examination.  (*Id*. at ¶ I-7).  Upon entering Mr. Hill's cell, Dr. Luckey smelled urine and noticed yellow stains on Mr. Hill's underwear.  (*Id*. at ¶ I-8).  Mr. Hill's shackles were off during the examination.  Dr. Luckey examined Mr. Hill's physical appearance and conduct, as well as more closely examining some of his vital signs and conducting a neurological exam.  (*Id*. at ¶¶ I-9–10).

Dr. Luckey instructed the staff to provide Mr. Hill with something to eat and drink and then watched Mr. Hill eat and drink.  (*Id*. at ¶¶ I-12–13).  Dr. Luckey asked the jailers if they would clean Mr. Hill.  Dr. Luckey then observed Mr. Hill being showered.  Hill was able to stand up and walk

to the shower. (*Id*. at ¶ I-114). Dr. Luckey spent a total of one and a half hours with Mr. Hill on April 13, 2001. (*Id*. at ¶ I-14). Dr. Luckey directed the jail personnel to contact him if there were any other problems with Mr. Hill. (*Id*. at ¶ I-16). April 13, 2001 was the only occasion that Dr. Luckey saw Mr. Hill. (*Id*. at ¶ I-18). Dr. Luckey filled out a medical request sheet based on his examination of Mr. Hill. (*Id*. at ¶ I-119; Doc. #80, Ex. L). Dr. Luckey provided a five-step plan of care after seeing Mr. Hill, which he outlined in the jail's medical request form. Step one was to hydrate, clean, and nourish Mr. Hill. Step two was to observe Mr. Hill for a return of some lucidity. Step three was to reevaluate Mr. Hill's mental status and degree of emotional dysfunction. Step four was to offer Mr. Hill one can of Ensure six times a day. Step five was to encourage Mr. Hill to drink plenty of fluids. (Doc. #75 at ¶ I-120; Doc. #80, Ex. L).

On April 14, 2001, a member of the jail staff called Dr. Luckey's answering service regarding Mr. Hill. Dr. Luckey responded to a page from his answering service regarding Mr. Hill. Dr. Luckey instructed the jailers to continue hydrating Mr. Hill and, if his condition did not improve, at some point they were to send him to the emergency room at Helen Keller Hospital. (Doc. #75 at ¶ I-20).

The morning of April 15, 2001, the jailer on duty called paramedics to have Mr. Hill transported to the emergency room. Dr. Luckey consulted that morning with the emergency room doctor regarding Mr. Hill's condition. (*Id*. at ¶ I-21). Dr. Luckey also called Plaintiff Brad Hill, in order to get more information about what medication his father was taking. He then called someone at the Colbert County Jail to get permission for Brad Hill to go to his father's house to retrieve any medication. (*Id*. at ¶ I-22). At approximately 11:00 p.m., on April 15, 2001, Mr. Hill died. (*Id*. at ¶ I-23). The autopsy concluded that Mr. Hill died from a bilateral pulmonary emboli, secondary to

blunt force trauma. (*Id*. at ¶ I-24). Most pulmonary embolisms are discovered during an autopsy. Even if a patient is diagnosed with a pulmonary embolism in a hospital, this does not mean that the patient will survive. (*Id*. at ¶ I-25).

In addition to the facts outlined above, to which both parties have stipulated, Plaintiff alleges additional disputed facts. According to Plaintiff, Dr. Luckey did not treat the dog bite wound on Mr. Hill's ear during his visit with Mr. Hill. (*Id*. at ¶ II-3). Furthermore, Plaintiff asserts that it was inappropriate for Dr. Luckey to not have referred Mr. Hill for a mental evaluation, and that this was a violation of the Colbert County Sheriff's Department's Policy and Procedure Manual. (*Id*. at ¶ II-4). Plaintiff also states that Dr. Luckey filled out a Colbert County Jail medical request form regarding his examination of Mr. Hill and that Dr. Luckey noted on this form that Mr. Hill showed positive signs of a major mental illness; however, Plaintiff asserts Dr. Luckey did nothing to treat Mr. Hill for his mental illness. (*Id*. at ¶ II-12). Finally, Plaintiff alleges Dr. Luckey's failure to positively treat Mr. Hill's injuries constituted deliberate indifference to Mr. Hill's serious medical needs (*Id*. at ¶ II-13); Dr. Luckey's failure to follow up with Mr. Hill's care constituted deliberate indifference to Mr. Hill's serious medical needs (*Id*. at ¶ II-14); and Dr. Luckey's failure to refer Mr. Hill to the hospital on April 14, 2006 constituted deliberate indifference to Mr. Hill's serious medical needs. (*Id*. at ¶ II-15).

On April 3, 2003, Plaintiff filed his original complaint alleging civil rights violations against a number of defendants, and the court later permitted Plaintiff to amend his complaint on March 15, 2004 to include Defendant Luckey as a defendant (Doc. #18). The court subsequently denied Defendant Luckey's Motion for Summary Judgment (Doc. #47), finding that both Plaintiff's claim

against Defendant Luckey and Plaintiff's Amended Complaint related back to Plaintiff's original complaint, making Defendant Luckey's statute of limitations defense inapplicable.

**III.    Defendant's Motion to Strike the Testimony of Dr. Simon M. Whitney, M.D.**

Defendant Luckey moves to strike the deposition testimony of Plaintiff's expert, Dr. Simon M. Whitney, on two grounds: as a medical provider, Defendant Luckey alleges Dr. Whitney is not similarly situated to Dr. Luckey as defined under the Alabama Medical Liability Act ("AMLA"), thereby making Dr. Whitney incompetent to testify against Dr. Luckey;[1] and, secondly, Dr. Whitney

---

[1] Since the court finds Dr. Whitney's testimony properly stricken on other grounds, it declines to reach the AMLA issue. However, since the parties devoted much of their respective efforts to the issue, a brief discussion is warranted.

The AMLA provides that, in an action against a health care provider for medical malpractice, "the plaintiff shall have the burden of proving by substantial evidence that the health care provider failed to exercise such reasonable care as other 'similarly situated' health care providers." ALA. CODE § 6-5-548(a). This burden is met by providing testimony regarding the applicable standard of care by an expert who is "similarly situated" to the defendant. *See King v. Correctional Medical Servs., Inc.*, 919 So. 2d 1186, 1193 (Ala. Civ. App. 2005). The AMLA sets forth specific requirements for any expert witness testimony submitted against a defendant medical provider such as Defendant Luckey, defining both the standards for medical providers who are not board-certified specialists and those who are board-certified specialists. *See* ALA. CODE § 6-5-548(b)–(c)(1975). Since he was board certified in family practice on the date of the alleged malpractice, *Ronderos v. Rowell*, 868 So.2d 422, 426–27 (Ala. 2003), Dr. Luckey is a board-certified specialist in the area of family practice for the purposes of AMLA. ALA. CODE § 6-5-548(c)(1975). Under the AMLA, whenever the health care provider whose actions allegedly breached the standard of care is a board certified specialist, a "similarly situated healthcare provider" is one who:

> (1) Is licensed by the appropriate regulatory board or agency of this or some other state.
>
> (2) Is trained and experienced in the same specialty.
>
> (3) Is certified by an appropriate American board in the same specialty.
>
> (3) Has practiced in the same specialty during the year preceding the date that the alleged breach of the standard of care occurred.

ALA. CODE § 6-5-548(c)(1975).

In the present case, Defendant is charged with violating the standard of care to which a board certified family practice provider is held (Doc. #18 at ¶ 75–78), as he was board certified in family

is not qualified to testify under Federal Rule of Evidence 702 because his testimony is (1) unreliable as evaluated under *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579 (1993), and (2) irrelevant in that it will not assist the trier of fact. (Doc. #111). For the reasons set forth below, the court finds that because Dr. Whitney has failed to substantiate his theory of causation with any type of scientific or other evidence, his testimony would not be helpful to the trier of fact, is unreliable, and thus is properly excluded under *Daubert*.

A.    **The *Daubert* Standard**

In *Daubert*, the Supreme Court held that the Federal Rules of Evidence mandate that the trial judge act as a gatekeeper, and exclude unreliable expert testimony, so as to ensure the jury receives only reliable and relevant scientific testimony. *Daubert*, 509 U.S. at 589, 592–93; *see also* FED R. EVID. 702; *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 148 (1997) (reiterating that "[n]either the difficulty of the task nor any comparative lack of expertise can excuse the judge from exercising the 'gatekeeper' duties that the Federal Rules impose"); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S.

---

practice and practicing this specialty at the time of the alleged breach. (Doc. #111, *see also* Doc. #95 Ex. A). Plaintiff's expert, Dr. Whitney, is also a board certified family practice specialist, a licensed medical doctor, and has practiced in this discipline during the year preceding the date of Defendant's alleged breach of the standard of care. Defendant admits that is the case (Doc. #111 at 5), but contends that the AMLA's definition of "similarly-situated medical provider" demands that the testifying expert work in the same work environment as the provider who allegedly breached the standard of care, here a jail setting. Although the court declines to reach that issue today, it does refer the defendant to several cases, including *Vaughan v. Oliver*, 822 So.2d 1163, 1169 (Ala. 2001), holding the AMLA does not require that a similarly situated health-care provider work in the same work environment as the provider accused of error. *See also Holcomb v. Carraway*, 2006 WL 1046459, * 7 (Ala. April 21, 2006); *Dowdy v. Lewis*, 612 So.2d 1149 (Ala. 1992). The court has considered *Bradley v. Mariner Health, Inc.*, 315 F.Supp.2d 1190 (S.D. Ala. 2004) a case cited by Defendant. Again, the court's ruling that Dr. Whitney's proffered testimony is inadmissible under *Daubert* renders this issue moot. But if the admissibility of Dr. Whitney's testimony turned on the AMLA arguments urged by Defendants, the court would find *Bradley* distinguishable from the present action.

137, 158–59 (1999) (noting the trial court has no "discretion to abandon the gatekeeping function … [or] to perform the function inadequately"); *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002) (stating that "[r]ulings on admissibility under *Daubert* inherently require the trial court to conduct an exacting analysis of the proffered expert's methodology").

A *Daubert* analysis consists of a two-pronged test: whether the expert's testimony is reliable, being grounded in scientific knowledge, and whether the testimony is relevant, thereby assisting the trier of fact to evaluate the issues in the case. *McDowell v. Brown*, 392 F.3d 1283, 1298–99 (2004). Elaborating on the first prong, the *Daubert* court proposed a non-exhaustive list of four factors to facilitate the trial court's review of expert testimony admissibility. These suggested factors included: whether the theory or technique "can be (and has been) tested;" "the known or potential rate of error;" "whether the theory or technique has been subject to peer review and publication;" and whether the scientific theory or technique has gained "general acceptance" in the relevant scientific community. *Daubert*, 509 U.S. at 593-94.

The key to analyzing the second prong of *Daubert* is determining whether the expert's testimony assists the trier of fact. *McDowell*, 392 F.3d at 1299 (citing FED. R. EVID. 702). This "inquiry must be 'tied to the facts' of a particular 'case.'" *Kumho*, 526 U.S. at 150 (1999) (citing *Daubert*, 509 U.S. at 591). In other words, "[t]he relationship must be an appropriate 'fit' with respect to the offered opinion and the facts of the case. …there is no fit where a large analytical leap must be made between the facts and the opinion." *McDowell*, 392 F.3d at 1299 (citing *Daubert*, 509 U.S. at 591; *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997)).

Using the analytical framework outlined above as a guide to assess the admissibility of Dr. Whitney's testimony in this case, the court finds that Dr. Whitney's testimony fails both prongs of

7

the *Daubert* test. As to reliability, the court concludes that Dr. Whitney's testimony about the cause of Plaintiff's injury is lacking the appropriate scientific foundation and is too speculative in nature to be considered "scientific knowledge," which the *Daubert* standard demands. Moreover, the court does not believe Dr. Whitney's testimony would be helpful to the jury, and so it must be excluded as irrelevant under the Federal Rules of Evidence.

### B. Dr. Whitney's Theory of Causation is Unsubstantiated

Although Dr. Whitney may be a highly qualified physician, the court must consider the scientific basis of his testimony to determine its reliability. For it to be reliable, Dr. Whitney's testimony must be "'scientific,' meaning grounded in the methods and procedures of science," and must represent "'knowledge,' meaning something more than subjective belief or unsupported assumptions." *McDowell*, 392 F.3d at 1298. This inquiry is separate from Dr. Whitney's professional and experiential qualifications, which the court does not question; however, "[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based on some recognized scientific method." *Id*.

As there appears to be much confusion among the parties, the court will first analyze the discrete medical question on which Dr. Whitney's testimony is to be offered to the jury–that of how Plaintiff claims Dr. Luckey's alleged negligence caused Mr. Hill's death. Under Alabama law, "[t]o prove causation in a medical malpractice case, the plaintiff must prove, through expert testimony, that the alleged negligence probably caused, rather than only possibly caused, the plaintiff's injury." *University of Ala. Health Servs. Found., P.C. v. Bush*, 638 So.2d 794, 802 (Ala.1994). Since Plaintiff complains of Dr. Luckey's medical malpractice resulting in Mr. Hill's wrongful death, relevant medical testimony by Dr. Whitney would involve *only* that testimony related to the actual cause of

Mr. Hill's death and any associated negligence of Dr. Luckey. Both parties agree that the cause of Mr. Hill's death was bilateral pulmonary emboli, secondary to blunt force trauma. (Doc. #75 ¶¶ I-23-24).

In light of this agreement about the cause of Mr. Hill's death, the court may now evaluate the reliability of Dr. Whitney's testimony as to the cause, diagnosis, and treatment of a pulmonary embolus. Dr. Whitney's deposition testimony reveals (Doc. #111, Ex. Q. at 105-106), and the parties jointly agree (Doc. #75 ¶ I-25), that most pulmonary emboli are not discovered, nor even suspected, to be the cause of death until the autopsy is performed.[2] Assuming *arguendo*, that this fact does not, in and of itself, negate Plaintiff's theory of causation as to how Dr. Luckey's malpractice contributed to Mr. Hill's death, the court has examined Dr. Whitney's other testimony concerning pulmonary emboli. Dr. Whitney admitted that a pulmonary embolus can often have vague and non-specific symptoms, or "no symptoms at all." (Doc. #111, Ex. Q. at 105). When asked to list the specific symptoms that may be associated with a pulmonary embolus, Dr. Whitney was unable to identify any specific symptoms other than those directly referred to by Defendant's counsel. (*Id*. at 109–10). After describing two possible treatments for pulmonary emboli, Dr. Whitney admitted to not having the requisite knowledge to answer the question, and admitted to not having retrieved any research on the issue. (*Id*. at 110–11). He concluded his answers on possible treatments for pulmonary emboli by acknowledging that he would have to defer to other experts on those issues. (*Id*. at 113). Finally, he admitted to having to speculate about the time that the deep venous thrombosis (DVT) in Mr. Hill's arm developed that eventually led to the pulmonary emboli, causing his death,

---

[2] *See also* Doc. #98, Ex. D. at 26, where Dr. Lauridson, the forensic pathologist who performed the autopsy on Mr. Hill, testified that pulmonary emboli are often first diagnosed at autopsy and unsuspected during the life of the deceased.

acknowledged that Dr. Luckey would have had no way to detect it during the April 13, 2001 visit. (*Id*. at 115–16, 192–93). Most importantly, during his second deposition, Dr. Whitney admitted to not having done any further research, nor making any supplemental reports. (Doc. #114, Ex. U at 8-9).

Applying the four *Daubert* factors cited above to Dr. Whitney's proposed testimony, the court finds it to be unreliable. In this Circuit, "[a]n expert opinion is inadmissible when the only connection between the conclusion and existing data is the expert's own assertions." *McDowell v. Brown*, 392 F.3d 1283, 1300 (2004). Dr. Whitney has cited no publications, treatises, or other data upon which his opinions are based regarding pulmonary emboli, their causes and diagnoses. Dr. Whitney did produce some research on dehydration and Rhabdomyolysis, but makes assertions and conclusions as to Dr. Luckey's negligence and its causal connection to Mr. Hill's death that go far beyond this data. Indeed the data he points to contains no information regarding pulmonary emboli–the central medical issue in the case. Accordingly, the court concludes that these mere assertions fall below the generally accepted standard of reliability. *See id*.

### C. Dr. Whitney's Theory of Causation Would Not Aid the Jury

In addition to not being reliable, the court finds that Dr. Whitney's proposed testimony would fail the second prong of the *Daubert* test as it would not aid the jury. *Daubert v. Merrell Dow Pharm., Inc.* 509 U.S. 579, 591 (1993) (citing FED. R. EVID. 702). Under *Daubert*, "scientific testimony does not assist the trier of fact unless the testimony has a justified scientific relationship to the pertinent facts." *McDowell*, 392 F.3d at 1299 (citing *Daubert*, 509 U.S. at 591); *see also Gen. Electric Co. v. Joiner*, 522 U.S. 136 (1997). Although generally directed to the issue of causation and Dr. Luckey's negligence–the "pertinent facts"–Dr. Whitney's conclusions require "a large

analytical leap [that] must be made between the facts and the opinion," and, therefore, do not have the requisite scientific relationship to those facts. *Gen. Electric Co.*, 522 U.S. at 146. For reasons already discussed, Dr. Whitney can offer little meritorious testimony regarding causation other than speculation and unsubstantiated conclusions. The court is hesitant to allow such unreliable testimony to reach the jury, since questionable testimony would only confuse, rather than clarify, the issue for the trier of fact.

Additionally, even if Dr. Whitney's testimony is relevant to the issue of causation under *Daubert* and Federal Rule of Evidence 702, the court finds, in the alternative, that such testimony is properly excluded under Federal Rule of Evidence 403. That Rule states: "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." FED. R. EVID. 403. As noted above, the court finds Dr. Whitney's testimony on causation and Dr. Luckey's corresponding negligent acts to be unsubstantiated and unreliable. Therefore, even if it were not due to be excluded under Federal Rule of Evidence 702 and the *Daubert* test–and it is–the court would exclude Dr. Whitney's testimony because it creates a danger of confusing the jury about the issue of causation and is likely to mislead the jury on this issue. Therefore, even if Dr. Whitney's testimony had some limited probative value, that is substantially outweighed by the danger that the testimony would be unfairly prejudicial, confuse the issues, or mislead the jury.

**IV.     Defendant's Motion for Summary Judgment**

Defendant Luckey also moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. Because the court has granted Defendant Luckey's Motion to Strike the Testimony

11

of Dr. Whitney, it also concludes that Plaintiff has failed to produce evidence to support an element of his claim—namely that of causation—against Dr. Luckey, and therefore grants Dr. Luckey's Motion for Summary Judgment.

### A. Standard of Review

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R .CIV. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249. The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The method used by the party moving for summary judgment to discharge its initial burden on the motion depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428

(11th Cir. 1991) (en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; *i.e.*, facts that would entitle it to a directed verdict if not controverted at trial. *See Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial. But it does not require evidence negating the non-movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case. *See Fitzpatrick*, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest

on mere allegations, but must set forth evidence of specific facts. *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## B. Analysis of Medical Malpractice Claims

In medical malpractice cases, "[t]he plaintiff must prove the alleged negligence through expert testimony, unless an understanding of the alleged lack of due care or skill requires only common knowledge or experience." *McAfee v. Baptist Med. Ctr.,* 641 So.2d 265, 267 (Ala.1994). Further, "[i]n medical malpractice cases, the plaintiff must prove that the alleged negligence 'probably caused the injury.'" *Id*. Because the court has granted Defendant's Motion to Strike the Testimony of Dr. Whitney, and as Plaintiff has not produced any other expert testimony on the alleged lack of due care or skill of Dr. Luckey, the court determines Defendant Luckey is entitled to judgment as a matter of law. When, as here, the moving party has alerted the court to the absence of evidence to support an essential element of the non-moving party's case, the non-moving party may respond in one of two ways noted above. But if the non-moving party fails to either point out such evidence that is already on record or produce additional evidence to support his claim, the moving party is entitled to summary judgment. *See Fitzpatrick*, 2 F.3d at 1115-16. That is the case here. Plaintiff has failed to adequately produce evidence of Dr. Luckey's negligence and Defendant Luckey is entitled to judgment as a matter of law on Plaintiff's state malpractice claims.

Even if the court had not excluded Dr. Whitney's testimony, Defendant Luckey would still be entitled to prevail on his motion for summary judgment because Plaintiff has failed to establish Dr. Luckey's negligence as the proximate cause of Mr. Hill's death. "To prove causation in a medical malpractice case, the plaintiff must prove, through expert testimony*,* that the alleged negligence probably caused, rather than only possibly caused, the plaintiff's injury." *Univ. of Ala.*

*Health Servs. Found., P.C. v. Bush,* 638 So.2d 794, 802 (Ala.1994). As discussed in Part III.B, *supra*, Dr. Whitney's testimony proffers unsubstantiated claims and unsupported conclusions, which fail to show that Dr. Luckey's alleged negligence "probably caused" the pulmonary emboli that were the assessed cause of Mr. Hill's death. Although Dr. Whitney opined that several factors likely contributed to Mr. Hill's death, and stated his own opinions about Dr. Luckey's care of Mr. Hill, he nevertheless failed to demonstrate a coherent theory of causation or produce any data to corroborate his suppositions. Therefore, the court finds that Plaintiff, by offering only this insufficient evidence on the element of causation, has failed to rebut Defendant's motion for summary judgment, and, that Defendant Luckey is entitled to judgment as a matter of law on Plaintiff's state malpractice claims.

    **C.**    **Analysis of Deliberate Indifference Claim**

In his claim under 42 U.S.C. § 1983, Plaintiff also asserts that Defendant Luckey engaged in deliberate indifference toward Mr. Hill's medical needs, and this violated Mr. Hill's constitutional rights to due process under the Fourteenth Amendment. The Eighth Amendment prohibits infliction of "cruel and unusual punishments." U.S. CONST. amend. VIII. "After incarceration, only the 'unnecessary and wanton infliction of pain'. . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Ingraham v. Wright*, 430 U.S. 651, 670 (1977) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citations omitted)). In *Estelle v. Gamble*, the Supreme Court held that a prison official's "deliberate indifference to [the] serious medical needs of [a] prisoner[ ] constitutes the unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment." 429 U.S. at 104 (internal quotation marks and citation omitted); *see Campbell v. Sikes*, 169 F.3d 1353, 1363 (11th Cir.1999). Thus, deprivation or denial of adequate medical treatment to prisoners or pre-trial detainees in state custody has been found to violate the Eighth and the Fourteenth

Amendments, respectively.³ *See Farrow v. West*, 320 F.3d 1235, 1242–43 (11th Cir. 2003). "However, not 'every claim by a prisoner that he has not received adequate medical treatment states a violation of the [Constitution].'" *McElligott v. Foley*, 182 F.3d 1248, 1254 (11th Cir.1999) (citation omitted); *see Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). The inadvertent or negligent failure to provide adequate medical care "cannot be said to constitute 'an unnecessary and wanton infliction of pain.'" *Estelle*, 429 U.S. at 105–06.

To prevail on this claim, Plaintiff "must satisfy both an objective and a subjective inquiry. First, the plaintiff must prove an objectively serious medical need. Second, the plaintiff must prove that the prison official acted with deliberate indifference to that need." *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir.2004) (internal quotation marks omitted) (quoting *Farrow*, 320 F.3d at 1243 (11th Cir.2003)). Both parties agree that Mr. Hill had medical needs, although the severity of these needs and the extent to which life-threatening severity, if any, could be detected, is disputed. (Doc. #75 ¶¶ 5, 8, 9, 10, 20-21, 23, 132, 142). Assuming that Mr. Hill had serious medical needs for the purpose of evaluating his claim of Dr. Luckey's deliberate indifference, the court turns to the subjective element of the claim.

---

³ Since Mr. Hill was a pre-trial detainee, his cruel and unusual punishment claims properly sound in the Fourteenth Amendment right to due process of law rather than in the Eighth Amendment. *See Taylor v. Adams*, 221 F.3d 1254, 1257 n.3; *Lancaster v. Monroe County, Alabama*, 116 F.3d 1419, 1425 n. 6 (11th Cir.1997) (comparing *Bell v. Wolfish*, 441 U.S. 520, 535 n. 16, (1979) (due process violation), with *Estelle v. Gamble*, 429 U.S. 97,(1976) (Eighth Amendment violation)). "[T]he standard for providing basic human needs to those incarcerated or in detention is the same under both the Eighth and Fourteenth Amendments." *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1024 n. 5 (11th Cir.2001) (en banc).

To satisfy the subjective element of deliberate indifference to Mr. Hill's serious medical needs, Plaintiff must prove three things: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." *Brown*, 387 F.3d at 1351; *see also Miller v. King*, 384 F.3d 1248, 1261 (11th Cir.2004) (noting, after *Farmer v. Brennan*, 511 U.S. 825, (1994), that gross negligence fails to satisfy state-of-mind requirement for deliberate indifference); *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir.1996) (same). Plaintiff must complete a two-step process to demonstrate the level of subjective knowledge necessary to impute to a defendant a sufficiently blameworthy state of mind for liability. That defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [ ] must also draw the inference." *Farmer*, 511 U.S. at 837.

Applying this test to Dr. Luckey, the court is not persuaded that Plaintiff has offered (or can point to) any evidence supporting a contention that Dr. Luckey was aware of facts from which an inference could be drawn that a substantial risk of serious harm existed and drew such an inference. The parties (and their experts) agree that there were no immediately observable symptoms of the pulmonary emboli, the condition that ultimately claimed Mr. Hill's life. (Doc. #111, Ex. Q. at 105; Doc. #75 ¶¶ I-25, IV-19; *see also* p. 9 and note 2 with accompanying text). Therefore, the court finds on this record that Dr. Luckey did not possess the necessary subjective intent to be held liable. Even if Plaintiff could demonstrate this subjective intent on the part of Dr. Luckey, Plaintiff has not offered any evidence on the remaining two prongs of the deliberate indifference test: there is no evidence that Dr. Luckey disregarded the risk of serious harm to Mr. Hill nor that, even if it could be said such disregard existed, it was in the form of conduct constituting more than gross negligence. Thus, review of the Rule 56 record makes clear that Plaintiff cannot establish the remaining two

17

prongs of the test. Dr. Luckey offered medical treatment on at least three separate occasions to Mr. Hill. (Doc. #75 ¶¶ I-6, I-20-21). The undisputed facts related to Dr. Luckey's treatment of Mr. Hill, his diagnoses of Mr. Hill's condition, his prescribed treatments for Mr. Hill, and his continuous monitoring of Mr. Hill's situation (*id*. at ¶¶ I-6-18, I-20-22) negate any claim that Dr. Luckey disregarded the severity of Mr. Hill's medical needs or that his conduct amounted to more than gross negligence. Therefore, this court finds that Plaintiff has failed to establish the requisite elements of his deliberate indifference claim against Dr. Luckey by providing insufficient evidence to support both the subjective and objective elements of such claim.

**V.     Conclusion**

Accordingly, Defendant's Motion to Strike the Testimony of Dr. Simon N. Whitney and Defendant's Motion for Summary Judgment are due to be granted. The court will enter an Order consistent with this Memorandum Opinion.[4]

**DONE** and **ORDERED** this ____5th____ day of September, 2006.

                                               R. DAVID PROCTOR
                                               UNITED STATES DISTRICT JUDGE

---

[4] Because there are remaining claims asserted by Plaintiff against Defendants other than Dr. Luckey which, for the most part, involve different facts and legal theories, and because the court is not yet prepared to rule on the motions directed at those other claims, the court will sever those claims, direct the Clerk to open a separate civil case number as to them, and allow Plaintiff's claims against those other Defendants to go forward in that separate action.